***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. National Surety Corporation was the carrier on the risk through January 8, 1998.
3. Defendant-employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act. The employer-employee relationship existed between defendant-employer and plaintiff on July 10, 1997, the admitted date of the accident referenced in Industrial Commission file number 756600 and on November 5, 1997, the admitted date of the accident in Industrial Commission file number 802978.
4. Plaintiff sustained a compensable injury by accident to his right elbow arising out of his employment on July 10, 1997 and to his left elbow arising out of his employment on November 5, 1997.
5. Plaintiff is, and was as of July 10, 1997, the sole owner of defendant-employer.
6. Plaintiff's average weekly wage at the time of his injury on July 10, 1997, was $596.15, yielding a compensation rate of $397.63 per week. Plaintiff received weekly temporary total disability compensation for the 1997 statutory maximum amount of $512.00 per week from July 10, 1997, up through and including January 22, 2001, based upon an incorrect average weekly wage of $1,250.00. Plaintiff has received temporary total disability benefits at the rate of $397.63 per week since January 22, 2001, through the present and continuing.
7. It is stipulated that all parties are properly before the Commission and the Commission has jurisdiction over the parties and the subject matter.
8. Plaintiff is the individual depicted in defendant-carrier's surveillance video dated September 21 and 22, 2000, and there is no question as to the authenticity or admissibility into evidence of this videotape and Report of Investigation by DDI dated September 28, 2000.
9. In addition, the parties stipulated into evidence the following:
 1. Plaintiff's medical records with Dr. William Parker, Jr., Dr. S. Susan Torres, Dr. Donald Getz, and Dr. David A. Esposito.
2. Form 19 dated July 16, 1997.
3. Form 19 dated December 3, 1997.
4. Form 18 dated December 1, 1998.
5. Defendant-Carrier's Form 33 dated September 26, 2000.
6. Defendant-Employer's Form 22 dated September 29, 2000.
7. Plaintiff's Form 33R (Undated).
 8. Form 90 Dated September 26, 2000, and Executed on October 27, 2000.
 9. Plaintiff's Responses to Defendant-Carrier's First Set of Interrogatories and Requests for Production of Documents dated October 26, 2000.
 10. Plaintiff's Responses to Defendant-Carrier's First Requests for Admissions dated October 26, 2000.
11. Limited Mediated Settlement Agreement dated January 22, 2001.
 12. Plaintiff's Responses to Defendant-Carrier's Second Set of Interrogatories and Requests for Production of Documents dated February 23, 2001.
 13. Defendant-Carrier's Form 24 dated February 7, 2001, and attached Addendum "A" in Support of its Application to Terminate Plaintiff's Compensation.
 14. Plaintiff's and Defendant-Employer's 1996, 1997, 1998, and 1999 Income Tax Returns.
15. Plaintiff's Form 24 Response dated February 23, 2001.
16. Form 60 dated September 9, 1997.
 17. Defendant-Carrier's Supplemental Materials in Support of its Form 24 Application to Terminate Plaintiff's Benefits dated March 23, 2001.
 18. 1099-MISC 2000 Tax Form by Williams Classic Homes, Inc. reflecting payment to Plaintiff for services rendered for Williams Classic Homes, Inc. in the total amount of $9,774.02.
 19. Invoices submitted by Plaintiff to Williams Classic Homes, Inc. as identified by Plaintiff in response to Defendant-Carrier's three separate discovery requests.
 20. Invoices submitted by Plaintiff to Custom Colors as identified by Plaintiff in response to Defendant-Carrier's three separate discovery requests.
 21. Plaintiff's Supplemental Response dated March 26, 2001, to Defendant-Carrier's Supplemental Materials in support of Defendant-Carrier's Form 24 application.
 22. Administrative Order by Special Deputy Commissioner Gina E. Cammarano filed April 3, 2001.
 23. Deposition transcripts of W. Earl Williams dated February 6, 2001, and Dr. David Esposito dated August 7, 2001.
24. Plaintiff's personnel file and payroll records.
 25. DDI Surveillance Tape of Plaintiff dated September 21 and 22, 2000, and identified by file number 00-232-103R3.
 26. DDI's Report of Investigation dated September 28, 2000, by DDI President, Sally Devlin, and field investigator, F. Williamson.
 27. Plaintiff's 1099-MISC 2000 Tax Form allegedly issued to Plaintiff's brother, Robert Lee Ricks, in the total amount of $2,500.00.
 28. Undated handwritten letter by Custom Colors Paint Decorating representative, Barbara Price, listing dates worked by Plaintiff for Custom Colors "for installing carpet and vinyl" and the amounts paid on each date, totaling the sum of $8,933.40, faxed on August 16, 2001.
 29. The parties' Pre-Trial Agreement dated June 18, 2001, which was submitted to the undersigned at the hearing on June 26, 2001.
 *********** Based upon the findings of fact found by the Deputy Commissioner and the evidence of record, the Full Commission finds as follows:
 FINDINGS OF FACTS 1. Plaintiff, at the time of the hearing before the Deputy Commissioner, was 47 years old.
 2. On July 10, 1997, plaintiff solely owned and operated a carpet, vinyl and flooring installation and repair business known as CVT Installations. Plaintiff was also an employee of his business and performed the manual, physical labor in the carpet and flooring installation services. Plaintiff's normal job duties included removing and installing carpet, linoleum, tile, vinyl and wood flooring in houses, carrying carpet, laying and stretching the carpet and trimming the flooring.
 3. On July 10, 1997, plaintiff suffered an injury by accident to his right elbow while carrying carpet through a doorway of a house. Subsequently, on November 5, 1997, plaintiff suffered another injury to his left elbow from repetitive motion from installing carpet and flooring. Plaintiff remained the sole owner, manager and operator of defendant-employer at least until December of 2000.
 4. Plaintiff was paid temporary total disability at the statutory maximum compensation rate for 1997 of $512.00 per week from July 11, 1997, through the parties' mediation conference and Limited Mediated Settlement Agreement of January 22, 2001. Plaintiff was paid this amount based upon the Form 19's he completed on behalf of his business for both of his injuries. According to plaintiff's Form 22 and the parties' stipulation at the hearing before the Deputy Commissioner, plaintiff's correct average weekly wage was $596.15, yielding a compensation rate of $397.63 per week.
 5. Plaintiff received weekly temporary total disability benefits in the amount of $397.63 from January 22, 2001, to the date of hearing and continuing.
 6. On August 27, 1997, plaintiff was diagnosed with right tennis elbow for his July 1997 injury by Dr. Donald Getz. Plaintiff treated with Dr. Getz from August 27, 1997, to March 11, 1998, a total of eight times primarily for right elbow pain. From March 25, 1998 through the time of the hearing before the Deputy Commissioner, plaintiff treated with Dr. David Esposito. During the course of his treatment, plaintiff presented for right and left elbow complaints, intermittently.
 7. On February 11, 1999, Dr. Esposito performed a lateral tennis elbow release with partial lateral epicondylectomy on plaintiff's right elbow. The normal recovery time following this type of surgical procedure to return to performing full-duty, heavy labor is three months. Despite this surgical procedure, plaintiff was diagnosed with bilateral epicondylitis for both of his elbows, over four months later, on June 25, 1999, the left elbow being worse than his right.
 8. On August 20, 1999 and October 15, 1999, plaintiff primarily presented for treatment of his left elbow. From October 15, 1999 to February 4, 2000, a period of almost four months, plaintiff did not present for treatment with Dr. Esposito. From August 23, 1999 to February 4, 2000, plaintiff, individually, submitted a total of 41 invoices to Custom Colors and Williams Classic Homes for carpet installation work.
 9. After his February 4, 2000, visit and over eight months later, plaintiff presented for treatment with Dr. Esposito on October 11, 2000. From February 4, 2000 to October 11, 2000, plaintiff, individually, submitted a total of 21 invoices to Williams Classic Homes for carpet installation work.
 10. Plaintiff was never assigned any work restrictions by Dr. Esposito.
 11. However, plaintiff contends he can only engage in sedentary or light-duty activities on a daily basis. Such activities according to plaintiff include vacuuming once a week, cutting his grass on an infrequent basis, sitting and watching television, occasionally washing his car and occasionally washing his dishes. Plaintiff contends he cannot, however, wash or fold his own clothes due his bilateral elbow condition. Plaintiff's claims are inconsistent with the activities revealed on the surveillance video dated September 21 and 22, 2000. Plaintiff's claims are also inconsistent with the numerous invoices he submitted to Custom Colors and Williams Classic Homes in 1999 and 2000 and other independently verifiable evidence offered in this matter. Plaintiff's claims are not supported by the greater weight of the evidence, and therefore, are not credible.
 12. The standard treatment to prevent recurring lateral epicondylitis and resulting elbow pain includes anti-inflammatory medications, ice massages, deep friction massages, light weight strengthening exercises, and stretching exercises. Prevention also includes avoiding or limiting repetitive activities, limiting prolonged gripping, limiting heavy lifting, and easing the stress or strain placed on the elbows and wrists.
 13. Plaintiff testified the work reflected on the invoices he submitted to Williams Classic Homes and Custom Colors was for work that employees or contract labor of CVT Installations performed under his supervision. Plaintiff repeatedly testified that he, himself, did not physically perform any services.
 14. The Administrative Order by Special Deputy Commissioner Cammarano recites that plaintiff argued all work conducted by his business following the development of his occupational disease in 1997 was performed `through the use of contract labor and helpers' and not by plaintiff. Plaintiff's testimony and his arguments during the Form 24 hearing are inconsistent with his discovery responses of record. Specifically, plaintiff states "I attempted to work for my company, CVT Installations, through mid-December 2000. At that time, I discontinued operations and sold my van due to the condition of my elbows." Plaintiff also states "I had no helpers in 1999 due to the drop-off in my volume of business." Plaintiff's testimony is not supported by the greater weight of the evidence, is inconsistent with the 37 invoices submitted to Custom Colors in 1999, and is therefore, not credible.
 15. The only evidence plaintiff has offered to support his claim that he hired or used contract labor and helpers was the 2000 1099-MISC tax form from himself, individually, to his brother, Robert Lee Ricks, in the amount of $2,500.00. Aside from this lone record, plaintiff failed to produce any employee payroll records, employee paychecks, and employee W-2 or 1099 tax forms for the years of 1998, 1999, or 2000.
 16. Plaintiff's 1997 and 1998 income tax returns for himself, individually, and his company reflect business-related mileage of "40,000" for each year. Plaintiff's tax returns for these years also reflect $12,600.00 and $13,000.00 for business-related "car and truck expenses", despite receiving temporary total disability benefits from defendant-carrier through all of 1998.
 17. The invoices plaintiff submitted to Custom Colors total the sum of $11,066.88 for the period of August 23, 1999, to December 10, 1999. The invoices plaintiff submitted to Williams Classic Homes total the sum of $10,209.63 for the period of January 14, 2000, to December 17, 2000.
 18. Defendant-Carrier requested plaintiff produce his business records from 1997 through 2000, including employee payroll records, W-2 statements, 1099 tax forms, paychecks, and other related documentation. Aside from his income tax statements for these years, plaintiff only produced the 1099-MISC tax form he completed for his brother.
 19. Williams Classic Homes, Inc. completed a 2000 1099-MISC tax form to plaintiff, individually, reflecting payment for services rendered in the amount of $9,774.02.
 20. All of the invoices plaintiff submitted to Custom Colors and Williams Classic Homes were by plaintiff, individually. All payments for services rendered by Custom Colors and Williams Classic Homes were to plaintiff, individually. Plaintiff, individually, was listed as a vendor/supplier of services by, and to, Williams Classic Homes. Custom Colors paid plaintiff, individually, for "installing carpet and vinyl." An invoice bearing the date of September 21, 2000, from plaintiff, individually, to Williams Classic Homes coincides with the date plaintiff is seen on the surveillance videotape at Williams Classic Homes.
 21. Plaintiff continued to receive temporary total disability benefits during all of 1998, 1999 and 2000, despite engaging in the same carpet installation activities and running his business as he had done prior to his injuries in July and November of 1997. Plaintiff never notified defendant-carrier of his work activities until compelled to do so through discovery in February of 2001.
 22. In 1998, plaintiff claimed he was totally disabled from physically performing carpet installation services and from operating his business. As such, defendant-carrier continued to pay him temporary total disability benefits. Based upon plaintiff's 1998 income tax returns, however, plaintiff was actively engaged in physically performing carpet installation services for unknown parties throughout 1998 and in operating his business.
 23. Plaintiff was actively engaged in physically performing carpet installation services and operating his business from at least August 23, 1999, to December 17, 2000, for Custom Colors and Williams Classic Homes. Plaintiff failed to ever inform defendant-carrier of his work activities during these time periods. It was not until February of 2001 that defendant-carrier was provided with copies of plaintiff's invoices to Custom Colors and Williams Classic Homes.
 24. Plaintiff approached Earl Williams, owner of Williams Classic Homes, Inc., in early January of 2000 offering to provide flooring repair and installation services. When plaintiff approached Mr. Williams in January of 2000, plaintiff informed Mr. Williams that he did carpet work. Plaintiff did not communicate that he was suffering from any disabling injury, physical limitation, or give any indication that he could not perform carpet work for Williams Classic Homes.
 25. Plaintiff moved furniture and other objects back into his house, and otherwise "fixed up" his house, after Hurricane Floyd in late 1999. This information was in response to a Dr. Esposito's inquiry into the possible cause of his intermittent "flare up" of pain in his elbows. Moving furniture and otherwise fixing up his house in late 1999, together with his carpet work for Custom Colors and Williams Classic Homes in 1999 and 2000, more probably than not aggravated plaintiff's current bilateral elbow condition. Plaintiff did not present for treatment with Dr. Esposito from October 15, 1999, to February 4, 2000. After February 4, 2000, plaintiff did not visit Dr. Esposito with elbow complaints until October 11, 2000.
 26. Defendant-carrier was the liable party on the risk at the time of plaintiff's 1997 injury claims to his elbows. Defendant-carrier's policy lapsed on January 8, 1998.
 *********** Based on the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW 1. The person claiming the benefit of compensation has the burden of proving that the injury complained of resulted from an accident arising out of and in the course of the employment. Henry v. A.C. Lawrence Leather Company, 231 N.C. 477, 57 S.E.2d 760 (1950).
2. When defendants admit the compensability and liability of a workers' compensation claim, whether by the use of a Form 60 or through paying benefits beyond the statutory period provided for in G.S. §97-18(d), it does not create a presumption of continuing disability. As such, the burden of proving disability remains with the employee. Simsv. Charmes/Arby's Roast Beef, 142 N.C. App. 154, 159-160, 542 S.E.2d 277,281 (2001).
3. Under the North Carolina Workers' Compensation Act, a disability is defined as the incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment. N.C.G.S. § 97-2(9). An employee who cannot command wages in the competitive job market because of injury will be classified as disabled under the statute. The employee's earning capacity is based on his ability to command a regular income in the labor market. McGeev. Estes Express Lines, 125 N.C. App. 298, 300, 480 S.E.2d 416, 418
(1997).
4. An employee's ownership of a business could support a finding of earning capacity if the employee is actively engaged in the business, but only if the work involves skills marketable in the labor market. Id. Thus, the relevant inquiry, even in circumstances involving an employee's on-going business operations, is whether the injury has diminished the employee's earning capacity. Sims, 142 N.C. App. at 160,542 S.E.2d at 281 (2001).
5. Plaintiff has the burden of proving not only that he has obtained no other employment, but also that he is unable to obtain other employment. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595,290 S.E.2d 682, 684 (1982).
6. Plaintiff's post-injury earning capacity rather than plaintiff's actual wages are relevant in assessing any disability. Saums v. RaleighCommunity Hosp., 124 N.C. App. 219, 220-221, 476 S.E.2d 372, 374 (1996),rev'd on other grounds, Saums v. Raleigh Community Hosp., 346 N.C. 760,487 S.E.2d 746 (1997).
7. The test for determining whether the self-employed injured employee has wage-earning capacity is that the employee (i) be actively involved in the day to day operation of the business and (ii) utilize skills which would enable the employee to be employable in the competitive market place notwithstanding the employee's physical limitations, age, education and experience. Lanning v. Fieldcrest-Cannon, Inc., 352 N.C. 98, ___,530 S.E.2d 54, 61 (2000).
8. In passing upon issues of fact, the Commission is the sole judge of the credibility of the witnesses and of the weight to be given their testimony. It may accept or reject the testimony of a witness, either in whole or part, depending solely upon whether it believes or disbelieves the same. Anderson v. Northwestern Motor Company, 233 N.C. 372,64 S.E.2d 265 (1951).
9. Plaintiff did not prove by the greater weight of the credible evidence that he was unable to earn income as a result of his 1997 on-the-job injuries to his elbows and he has failed to carry his burden of proving temporary total disability. Henry v. A.C. Lawrence LeatherCompany, 231 N.C. 477, 57 S.E.2d 760 (1950).
10. Plaintiff was no longer disabled after August 23, 1999, because plaintiff's carpet work for Custom Colors and Williams Classic Homes through the end of 1999 and all of 2000 demonstrates his post-injury capacity was not diminished. Therefore, defendant-carrier's payments of temporary total disability benefits from August 23, 1999, were not due and payable under the Act. N.C.G.S. § 97-42; Saums v. RaleighCommunity Hosp., 124 N.C. App. 219, 220-221, 476 S.E.2d 372, 374 (1996),rev'd on other grounds, Saums v. Raleigh Community Hosp., 346 N.C. 760,487 S.E.2d 746 (1997).
11. Plaintiff was paid temporary total disability at the statutory maximum compensation rate for 1997 of $512.00 per week from July 11, 1997 through the parties' mediation conference and Limited Mediated Settlement Agreement of January 22, 2001. However, plaintiff's correct average weekly wage for his injuries in 1997 was $596.15, yielding a compensation rate of $397.63 per week. N.C.G.S. § 97-2(5).
12. Defendant-carrier is entitled to a credit for all benefits paid to plaintiff in excess of his compensation rate of $397.63 per week up to and including August 23, 1999 and for all benefits paid after August 23, 1999. N.C.G.S. § 97-42; Moretz v. Richards Assocs., 316 N.C. 539,342 S.E.2d 844 (1986).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission adopts and affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Plaintiff has failed to prove that he was disabled after August 23, 1999. Therefore, plaintiff's claims for further benefits must be, and the same are hereby, DENIED.
2. Defendant-carrier is entitled to a credit for all benefits paid to plaintiff in excess of his compensation rate of $397.63 per week up to and including August 23, 1999 and for all benefits paid after August 23, 1999.
3. Each side shall bear its own costs.
This the ___ day of May 2002.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________________ BERNANDINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN